The appellant will have 15 minutes. We're going to argue the entire case within 15 minutes, so if you're appealing, you have to address all the issues that you're going to appeal. You may reserve some time for rebuttal. Can you tell me how much time you need? I'll reserve half my time for rebuttal. Okay. Let's proceed. Please call the case. Sir, would you identify yourself and tell us who you represent? Good morning, Your Honors. My name is Fred Ahrensmeyer, and I represent the appellants in this matter, Trent Bateman, Lisa Bateman, and Brooke Decker. Please proceed. Your Honor, there's three issues that we raised in this appeal. This morning, I'd like to emphasize a few points, starting with the first point on appeal, and that's the question of whether the trial record, in this case, supported judgment against Lisa Bateman and Brooke Decker. In this case, the bankruptcy judge determined that they somehow interfered and prevented GEMCAP as well as Kalani Farms from recovering certain assets, certain property. A few important points that I'd like to reemphasize. We had a receiver at the time appointed by the state court who was in control. We had a trustee appointed by the bankruptcy court at the time who was in control. In fact, the Batemans had been evicted from one of the properties. I believe the property that the bankruptcy judge took issue with is a property identified as Kainalu, which was not part of the asset turnover. However, there were purportedly assets belonging to GEMCAP or Kalani Farms that remained on that property at the time that the adversary cases were filed. Hence, there was a preliminary injunction entered. The bankruptcy judge went on to hold Trent, Lisa, and Brooke all in contempt and awarded damages for interfering with and failing to return certain assets that were on the Kainalu property. But the record in this case shows that GEMCAP's, Kalani Farms' main person on the ground, John Trowbridge, admitted that he made pretty much no effort whatsoever to even access the property. In fact, Trent Bateman made demand that GEMCAP and Kalani Farms remove their assets from the Kainalu property by a certain date. That didn't happen. In fact, Mr. Trowbridge admitted that he never, never even asked Trent Bateman where the missing assets were or whether he could have access to the property. Whether he asked the receiver or the trustee and was unable to gain access through those people, well, Trent Bateman, Lisa Bateman, and Brooke Decker shouldn't be penalized if, in fact, the receiver or the trustee failed to comply. But I don't think that was the case here either way. I think this is, you know, in their answering brief, appellees, GEMCAP, they say, well, Lisa Bateman and Brooke Decker are guilty of inaction. They interfered by inaction. But, in fact, the inaction in this case came from GEMCAP, came from Kalani Farms. Can I ask you a question, counsel? Yes. The, you said he assessed damages against him, but don't they have the ability, isn't this more of a coercive sanction than a compensatory sanction in the sense that the bankruptcy judge said you still have a chance to remove the consequences of any prior bad behavior or lack of appropriate activity by turning over the assets that haven't been received? I think that might be a fair characterization. And even if that's true, then the question becomes, was contempt appropriate? Was anything... But, again, the contempt, and that's really my point, to the extent, I guess the point is they can obviate the consequences of the contempt entirely by now turning over assets. So what's the problem with that? I don't see a problem with that. But what the record doesn't support is, you know, any evidence that they failed to do so. Those assets were made available. Trent Bateman, in fact, invited GEMCAP and Polanyi Farms to remove their property by a certain date and it went unanswered. So really if contempt were ordered in this case, the contempt should be for violating the preliminary injunction. Violating the preliminary injunction would mean that they actively refused to turn over property or prevented GEMCAP from obtaining property. And the record simply doesn't support that. Especially, again, especially and most importantly with respect to Brooke and Lisa. You know, I submit that that argument applies to all three. However, the one witness that did testify at trial was Trent Bateman. For some reason the judge found his in-person testimony to be not credible, but it was consistent with his written testimony. It was consistent with prior testimony in the case. At the preliminary injunction hearing there was really no reason not to believe what he had to say. And then, in fact, John Trowbridge testified in person and he confirmed, he corroborated that he, in fact, made no effort whatsoever to ask where the assets were, to ask if he could have access to get the assets. And, in fact, Trent Bateman affirmatively again invited him to remove the assets and he gave him a deadline. And, sure, perhaps a deadline wasn't appropriate, but in any event that demand, it went completely unanswered. There was no request for additional time, no question about, well, what assets are there, what are, you know, what are we going to pick up, what do we need to remove this stuff. Simply stated, the party that is guilty of inaction, at least with respect to recovering these disputed access, it's GEMCAP and their agent, John Trowbridge of Polanyi Farms. Have your clients participated in turning over any assets since the sanction? I'm not aware. I haven't discussed that matter with them, but I'm not aware of any additional matters being turned over. Okay. Thank you. Again, those are the issues that I wanted to highlight this morning. I can address any additional questions the court might have. Otherwise, I'd like to reserve my remaining time for rebuttal. There doesn't appear to be any questions. Thank you, counsel. Will the respondent please appear? Identify yourself. Tell us who you represent. Yes, may it please the court. Mark Taylor here on behalf of GEMCAP Lending 1, LLC, the Appley. Sir, would you pick up a microphone and talk into it so we can hear you? Yes. I'm sorry. I'll lean forward. Usually my voice is too loud. I'm Mark Taylor for GEMCAP Lending 1, LLC, the Appley. Please proceed. There are three issues, as Mr. Ahrensmeyer notes, that are presented to the court today, and each of those issues is decided under a clear error standard. There's no argument that Judge Farris misapplied the law or applied an incorrect legal standard. And in this case, it's even a little bit more, because what we have is not an argument that Judge Farris excluded evidence improperly or he excluded a witness or led in testimony that he shouldn't have led in. What it is in this case is really an argument that Judge Farris heard the evidence and weighed it in correctly, and that is something that has a very high standard applied to it for overturning the decision of a trial court. And in making that decision, the judge ruled on the credibility of the witness. He listened to the witnesses, judged their credibility, and based his opinion, at least in part, on the credibility of those witnesses. And I want to point the court to several instances in Judge Farris' opinion where he specifically addressed that. On page 9 of his opinion, he stated that Mr. Bateman's testimony was false and his testimony was incredible, as in not credible. On page 18, he again characterized Mr. Bateman's testimony as false. On page 19, he said that Mr. Bateman's claims were false. On page 20, he found that Mr. Bateman's statement to be fundamentally false and legally unsustainable. He made these findings after a four-day trial that we all sat through. In addition, he conducted a two-day preliminary injunction trial in May of 2017, where he again had the chance to judge the credibility of the witnesses and made similar findings in that preliminary injunction order. So, Your Honor, what we have here, contrary to what Mr. Ahrensmeyer wants the court to believe, that his client was credible and the judge should have believed his testimony, the judge heard the testimony, didn't believe it, and this court shouldn't substitute its judgment for the credibility of the witnesses for the findings made by the trial court. With respect to the first issue raised, and that's really what Mr. Ahrensmeyer discussed in his opening, was whether or not there was any evidence that Lisa Bateman or Brooke Decker interfered with the transfer of assets to Jim Capp, the appellee. And really, if you look at that, it's a two-page argument of the brief, and it just says there's no evidence and really doesn't cite anything in the record. If you look at the record, there is evidence, and in fact, the preliminary injunction was not just don't interfere, it was turn it all over. So it was a mandatory injunction, not just a prohibitory injunction. That's correct, Your Honor. They were specifically directed to turn the property over. And that didn't happen, and the value of the missing property that was found by the trial court was $232,600, and that's not in dispute. There's been nothing raised on appeal that the trial court made an incorrect decision in valuing the property that was not turned over. And if you look at the record, there is a discussion in the record of what specifically was not turned over, and in fact, if you look at page 23 of the trial court's opinion, Judge Ferris goes through what Ms. Decker and Ms. Bateman did not do. And by the way, neither Ms. Bateman nor Ms. Decker testified at trial, and in fact, they didn't show up for trial. They had counsel there, so they didn't default, but they chose not to show up and testify at the trial. And the judge, although he didn't draw an inference from that, was certainly free to draw an inference from their failure to appear at trial. But what Judge Ferris found was that they had actual knowledge of the temporary restraining order, and later the preliminary injunction, and they could have complied with it. They chose not to turn over the domain and website that had been ordered to be turned over to my client. In fact, they forced GEMCAP to seek a further order specifically requiring the turnover of the intellectual property. They did not turn over emails, telephone numbers, or customer lists, and they did not give GEMCAP access to the Coloco property where much of the equipment was stored. So it's not just that they didn't comply and sat on their hands. It's a combination of sitting on their hands and then actively obstructing the process by not participating in the process. His argument is that I don't necessarily hear it as going to your first points on the intellectual property and the intangibles, for want of a better term. But as to the physical personal property, he's saying, Mr. Decker at least was saying, here it is, come get it. What Mr. Bateman said at one point was, please come pick it up by this date. And that was well after he had refused to turn over the property. So it's sort of like after the fact attempt to try to make himself look good by saying, I'll give you whatever you want. But he still did not coordinate access to the property even after that point. Part of the problem was with the receiver in place. The receiver said, maybe justifiably so, maybe not. I'm not going to just turn all this over to you without the Batemans being there. I'm sure because the receiver didn't want to face liability from the Batemans if something went wrong. And the Batemans exercised a pocket veto by simply not showing up and coordinating the access to the property. In fact, if you look at the record, it appears by moving property around, by moving the excavator that can never be found, by moving the gator, which is a four-wheeled vehicle, and leaving it on somebody left it on the side of the road and put sugar in the tank. We don't know who. And the judge couldn't say who, but that's in fact what happened. And that's just some of the property. Other property that was never turned over were all the records relating to accounts receivable, which mysteriously disappeared. So there was over a million dollars in accounts receivable that could not be collected because the records relating to those receivables were not made available. Mr. Bateman said, that wasn't my job. I left that to my wife and other people in the office. And so I don't know where those records are, but no one was able to locate them. And that obviously is a real loss to Jim Kapp. Now, the court did not award damages on that, but said that's part of the reasoning that I'm using to show that the preliminary injunction was not complied with. And you have to keep in mind, it wasn't just the preliminary injunction. It was at first the 363 sale order that was not complied with. Because what happened was the court entered the 363 sale order in March of 2017. The property was not turned over. My clients had to go get a temporary restraining order and then have a two-day preliminary injunction hearing in May of 2017. And on May 30th of 2017, the court entered the preliminary injunction requiring that certain actions take place that never took place. And that's why we ultimately had to have the trial in August of 2018 on the contempt sanctions and, of course, on the dischargeability issues that are also part of the appeal in this case. Do you disagree with my read of this, that the sanction that the judge imposed was more of a coercive sanction than a fully compensatory sanction, given the ability to I do. And it certainly gave them the ability to alleviate it. And to answer your question you posed to Mr. Ahrensmeyer, no property has been turned over since this trial or since the order was entered. The measurement, I think, was based upon the value of the property, which I think was probably the right way to do it. And it was, you know, a sanction to require them to do something which they haven't done. But they could have, theoretically. The second issue raised on appeal is that with respect to whether Mr. Bateman complied with the order. And some of that we've already gone through. I just really want to address the specific testimony that's cited in that point of order that's raised by this court. And that relates to the testimony of John Trowbridge, who was the representative for the purchaser from GEMCAP. GEMCAP bought the assets that were not turned over through the 363 sale and subsequently conveyed those to Polanyi Farms with an obligation to turn over all that property, some of which could not be turned over. Polanyi Farms, I know we refer to it in the documents as a record as a nominee. Was it related to GEMCAP or was it a separate distinct entity? It's a separate distinct entity. It's a third party entity. Mr. Trowbridge had done work with GEMCAP in the past, but this is an entity owned by Mr. Trowbridge. So if you look at the testimony, point of error two cites two or three pages worth of testimony, excerpted testimony from Mr. Trowbridge. And it's cleverly excerpted because if you read before, during, and after that testimony, Mr. Trowbridge goes through at length the efforts he went to to try to get the property and the many times he was frustrated in getting the property, not only from Mr. Bateman, but also by Mr. Bateman's refusal again to cooperate with the receiver. Most of that testimony that's cited in the brief relates to two items, an excavator and a Ford truck. And there's a lot more at issue in this case than an excavator and a Ford truck. And the efforts that Mr. Trowbridge went to to try to get that are very much detailed. If you look at the testimony, and I'll give you some record references. And these are actually the page references that are the file number references when you look at the record excerpts that were filed by the appellant in this case on page 504 of that. And I think as I recall, it's the blue numbering on the side of those pages. Mr. Trowbridge testified that Mr. Bateman refused access to the wet mill area, which was part of the property where a substantial amount of the equipment was stored. On page 505, he testified that he could not locate the excavator and did not find it. On page 506, he said the last time he was given access to the property was in April of 2017. And thereafter, he asked Mr. Van Buren, the receiver, for access multiple times, but Mr. Van Buren could not get the Batemans to coordinate on the access to the property. So again, it was the pocket veto being exercised by the Batemans. He later tried to get the gator, and we talked about that. He found it on the side of the road. On pages 517 through 520, he discusses being obstructed and being denied attempts to view the property and locate the equipment by the Batemans. And on page 522 through 523, he details when he found some of the equipment, it was left unprotected, had not been taken care of, and was simply left to kind of fall apart before he could even get to it to look at it and try to recover it. There are other examples of Mr. Bateman, as the Court will note, both in the record and it's detailed in the briefing and in the order. Mr. Bateman continued his assertion of personal ownership over a number of items of equipment right up to the trial. And what Mr. Bateman testified to at trial was, well, I guess I don't own it because the judge tells me I didn't own it. But in fact, he had consistently said that equipment that was GENCAP security, in fact, he owned individually and was not collateral of the entities, of the debtor entities. As of the trial date, the Green Forest website, which was the new business they had started, was still utilizing intellectual property and selling products that were products of the debtor entities, which GENCAP had bought at the 363 sale. He failed to turn over the customer list, including a customer list he kept on his phone and admitted that had not been turned over. So this is active participation by Mr. Bateman, not just sitting on his hands. Go ahead, but you're getting to the end of your time. I'd like you to spend a few minutes at least on the other issue. Okay, thanks. Issue three really deals with the dischargeability and it relates specifically to the $771,000 that was taken from a lockbox and diverted and also the two plus million dollars that was lent based upon the false borrowing-based certificates. Really, the sole basis for this argument is, this is exactly what Mr. Ahrensmeyer says, is that the courts, is that Mr. Bateman gave a testimony and he says that was credible and should not have been disregarded by the court. And again, that goes to the judge's ability to judge the credibility of the witnesses and he found Mr. Bateman to not be credible. The evidence that was presented first with respect to the participation for those borrowing-based certificates, that the borrowing-based certificates were inflated because they double-counted inventory and then a receivable, inventory that was sold, a receivable that was owed for that sale, which was never collected, but was double-counted. And as a result, Jim Kapp kept lending against that amount and lent an additional, in excess of $2 million, between $2 and $2.1 million after that false borrowing-based certificate was submitted. The testimony was that the Batemans knew that was false. We had testimony from Rachel Verhoeven, who was the former, Verhalen, who was the former bookkeeper for the Batemans, who testified they knew it when it went in, shortly after it went in. They told her not to tell Jim Kapp and they said continue reporting it on the borrowing-based certificates and try to bleed it off over time so nobody notices. And that's exactly the kind of conduct that courts in the past have found to be the basis for non-dischargeability. And we cited the court to the Tegeler case and the city case out of the Eastern District of Texas. Tegeler case is out of the Southern District of Texas and there's an opinion by Judge Parker that was later affirmed by the District Court out of the Eastern District, both of which were false borrowing-based certificate cases, where the court found that those were statements that were false that, if reasonably relied upon, could form the basis for non-dischargeability. The court also made a specific finding in this case and there was testimony from David Ellis, president of Jim Kapp, that they did, in fact, rely upon those statements and lent the money based on those. With respect to the $771,000 that was missing, again, the basis of the appellant's argument in this case is, well, we said we didn't do it so you should believe us. And again, that's the trial court's discretion to believe them or not believe them. Jim Kapp's representative, David Ellis, testified that they did a forensic accounting and found that that $771,000 that came into the lockbox, generally in the form of checks from customers, was diverted and used by debatements. And there was no rebuttal to that other than, no, we didn't do that. And so there is sufficient evidence, more than sufficient evidence, in the record to support the court's findings of non-dischargeability based both upon the false borrowing-based certificates and upon the diversion, the conversion under 523A6 of Jim Kapp's collateral. So, Your Honor, we believe there is sufficient evidence in the record and Judge Ferris's decisions on the credibility of the witnesses and the way that the evidence should not be overturned. Thank you. Thank you for your argument. Counsel, we'll hear rebuttal now. Thank you. Backing up to this argument that Jim Kapp asserts that Lisa Bateman and Brooke Deckert sat on their hands and they didn't do anything, I think it's important to recognize that when this case first started back in state court, I believe it was 2015, the receiver was appointed. He immediately fired Lisa, Brooke, and Trent. Trent was eventually hired back, but not Lisa and not Brooke. Lisa and Brooke had no control whatsoever. Once this case ended up in bankruptcy court, a trustee was appointed. The trustee then fired Trent Bateman. At that point, the receiver and the trustee were in control of the property. To say somehow that Lisa and Brooke, by doing nothing, prevented Jim Kapp from accessing their property, that's just not supported. That's not the case. They didn't have any ability to do so. What are the consequences for them, however, of their silence at the time of the trial? I mean, what you're arguing now is factually they shouldn't be subject to sanction because they have a defense to the claim of inappropriate inactivity, but they didn't defend before the bankruptcy court on that basis, did they? I mean, they didn't testify. They didn't provide any evidence to the court along the lines that you're now articulating. Your Honor, I would submit that the plaintiff had the burden here. It was the plaintiff's job to present evidence showing that they interfered or that they somehow sat on their hands when they had a duty to otherwise act, even though they couldn't because they were not in control. But again, that's, I think, yes. So the plaintiff came forward with evidence that there was an injunction, things were required, things didn't happen, they had obligations. I think if the plaintiff met that burden at that level, didn't the burden shift to them to explain why notwithstanding their inaction they shouldn't be sanctioned? Your Honor, our position is that the plaintiff never met that burden. That's our position in the brief. I know that's your position, but again, what more was the plaintiff supposed to do in proving a negative? I mean, once they established that they didn't get what they were entitled to, that there was a requirement that something be affirmatively done. Again, it's a mandatory injunction, not just a prohibitory injunction. And so they've established that they have been harmed in this circumstance. What are you saying they additionally had to prove? I mean, did they have to go in and prove state of mind, or could the judge not infer from this where they were required to do something and it's been proved that they didn't? Isn't that enough? Your Honor, I think they had to prove up front that something had to be affirmatively done by Brooke Decker, by Lisa Bateman, and in fact by Trent Bateman. I don't believe they did so. Can't the judge interpret his own order to say that's what I required? Well, I think the judge needs to be careful in interpreting his order and stick to the language that he used. And I don't think reviewing that order that there's any affirmative burden, especially on Lisa and Brooke to take any action, any specific action. And again, I would emphasize they weren't allowed to do so. They were not in control. There was a receiver. There was a trustee. They had long been removed from management. And there's this other question that came up about documents. Well, they didn't turn over documents. In fact, in the state court case, there was discovery, and they turned over all of their documents and the receiver sent everything to plaintiff's counsel. It was never returned back to the Batemans. They really had nothing as far as documents that they could have turned over. They certainly didn't prevent anybody, the receiver, the trustee, or anybody else from turning over documents. And I don't think the record... Where in the record did they put that argument before the court, the bankruptcy court? Your Honor, I can follow up. I don't have a record site immediately available for you. We can look. Okay. In any event, this morning my purpose here is to stress especially that Lisa and Brooke's involvement in this, yes, they didn't testify. They weren't subpoenaed. But I would maintain that the plaintiff didn't meet their burden, especially with respect to Lisa and Brooke. The burden of proof didn't shift because there was never any affirmative duty to act. And beyond that, again, the record doesn't show any evidence that they interfered. Again, what it does show is a lot of inaction by Jemcap and John Trowbridge. Moving on to the question of Trent Bateman's credibility as a live witness, I have to concede, yes, of course the judge, that's his burden. It's his duty to evaluate credibility and weigh evidence. But I think it's also important in this case to point out that this was kind of a hybrid of live testimony and written testimony. And it's pretty difficult for a judge to evaluate credibility based on written testimony. We did have Trowbridge. He was a live witness. We had Trent Bateman. He was a live witness. I don't think that Trowbridge's testimony, at least with his efforts to try to recover missing assets from the Kind of Leo property, I don't think it conflicts with Trent Bateman's testimony. I think it's consistent. And I invite your honors to review Mr. Trowbridge's live testimony moving forward. Finally, Jemcap argues about a lot of things that were done, actions that were taken to prevent return of property. But again, everything that they've cited to were things that happened before the preliminary injunction. From our position, if contempt or violation of the preliminary injunction is appropriate, it needs to be based upon conduct that happened after the preliminary injunction or at least with respect to some affirmative duty, some obligation that was ordered under the preliminary injunction that wasn't complied with. Your honor, I submit that the record does not support that. I see that I'm out of time. For those reasons, we respectfully request that the issues raised in the brief be reversed accordingly. Thank you, counsel.
judges: Kurtz, Taylor, Spraker